**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| ANDREW GIANCOLA, RAYMOND T. SCOTT, and PATRICIA SMITH, Individually and On Behalf of All Others Similarly Situated, | Case No.: 8:17-cv-02427-T-33AEP |
| Plaintiffs, | |
| v. | |
| LINCARE HOLDINGS INC., | |
| Defendant. | |

**SETTLEMENT CLASS REPRESENTATIVES' UNOPPOSED MOTION FOR FINAL
APPROVAL OF CLASS ACTION SETTLEMENT, AND
<u>INCORPORATED MEMORANDUM OF LAW</u>**

# TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION ................................................................................................. 1

II.  SUMMARY OF THE LITIGATION AND SETTLEMENT PROCEEDINGS ............................ 3

    A.   The Litigation ................................................................................. 3

    B.   Discovery ....................................................................................... 4

    C.   The Negotiations Leading to Settlement and the Preliminary Approval of Settlement ...................................................................................... 5

III. TERMS OF THE PROPOSED SETTLEMENT ................................................................ 6

    A.   The Settlement Class ....................................................................... 6

    B.   The Direct Settlement Benefits for the Class .................................... 7

        1.   The Settlement Fund ............................................................ 7

        2.   Enhanced Credit and Identity Monitoring and Protection Services Through TransUnion ............................................................. 8

        3.   Enhanced Data Security Measures ........................................ 8

    C.   The Costs of Notice and Administration .......................................... 9

    D.   Service Awards ............................................................................... 9

    E.   Attorneys' Fees and Expenses ....................................................... 10

    F.   Release ......................................................................................... 10

    G.   Implementation of the Notice Program and Claims Process ............. 11

IV.  ARGUMENT .................................................................................................... 12

    A.   Applicable Standards Generally Favor Approval of Class Action Settlements ............... 12

    B.   The Settlement Is Fair, Reasonable, and Adequate, and Thus Warrants Approval .......... 12

        1.   The Settlement Occurred at Arm's Length ........................... 13

        2.   The Settlement Will Avert Complex, Protracted, and Expensive Litigation ........................................................................... 14

        3.   The Factual Record is Sufficiently Developed to Enable Class Counsel to Make a Reasoned Judgment Regarding the Litigation and the Settlement .......... 15

      4.     Plaintiffs Faced Meaningful Obstacles to Success ................................................ 16

      5.     The Benefits Provided by the Settlement Are Fair, Adequate, and Reasonable Compared to the Range of Possible Recoveries ............................. 19

      6.     The Opinions of Class Counsel, Settlement Class Representatives, and Absent Class Members All Favor Approval of the Settlement ........................... 22

C.     THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS ................................ 22

D.     THE NOTICE PROGRAM, AS IMPLEMENTED, SATISFIES DUE PROCESS AND RULE 23 ............................................................................................................ 24

V.    CONCLUSION ......................................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Bennett v. Behring Corp.*,
    737 F.2d 982 (11th Cir. 1984) ................................................................. 12, 13

*Bennett v. Behring Corp.*,
    96 F.R.D. 343 (S.D. Fla. 1982) .................................................................... 19

*Burrows v. Purchasing Power, LLC*,
    No. 12-cv-22800, 2013 U.S. Dist. LEXIS 189397 (S.D. Fla. Oct. 4, 2013) ............. 17, 22

*Coles v. Stateserv Med. of Fla., LLC*,
    No. 17-cv-829-T-17AEP, 2018 U.S. Dist. LEXIS 39393 (M.D. Fla. Mar. 5,
    2018) ........................................................................................................ 23

*Columbus Drywall & Insulation, Inc. v. Masco Corp.*,
    258 F.R.D. 545 (N.D. Ga. 2007) .................................................................. 23

*Figueroa v. Sharper Image Co.*,
    517 F. Supp. 2d 1292 (S.D. Fla. 2007) .......................................................... 19

*Hapka v. Carecentrix, Inc.*,
    No. 16-cv-2372, 2018 U.S. Dist. LEXIS 68186 (D. Kan. Feb. 15, 2018) ...................... 18

*Hines v. Widnall*,
    334 F.3d 1253 (11th Cir. 2003) .................................................................... 23

*Holman v. Student Loan Xpress, Inc.*,
    No. 08-cv-305-T-23MAP, 2009 U.S. Dist. LEXIS 113491 (M.D. Fla. Nov. 19,
    2009) ........................................................................................................ 26

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*,
    No. 08-md-1998, 2009 U.S. Dist. LEXIS 119870 (W.D. Ky. Dec. 22, 2009) ..... 21, 23, 24

*In re Domestic Air Transp. Antitrust Litig.*,
    148 F.R.D. 297 (N.D. Ga 1993) .................................................................... 16

*In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*,
    293 F.R.D. 21 (D. Me. 2013) ........................................................................ 18

*In re Heartland Payment Sys.*,
    851 F. Supp. 2d 1040 (S.D. Tex. 2012) .......................................................... 24

*In re Target Corp. Customer Data Sec. Breach Litig.*,
    892 F.3d 968 (8th Cir. 2018) ........................................................................ 20

*In re U.S. Oil & Gas Litig.*,
    967 F.2d 489 (11th Cir. 1992) ...................................................................... 14

*Jones v. Flowers*,
    547 U.S. 220 (2006) ………...……………………………………………...…24

*Juris v. Inamed Corp.*,
    685 F. 3d 1294 (11th Cir. 2012) ................................................................... 24

*Leverso v. SouthTrust Bank of Ala., Nat'l. Ass'n.*,
    18 F.3d 1527 (11th Cir. 1994) ................................................................. 12, 13

*Lipuma v. American Express Co.*,
    406 F. Supp. 2d 1298 (S.D. Fla. 2005) ........................................................ 22

*Montoya v. PNC Bank, N.A.*,
    No. 14-cv-20474, 2016 U.S. Dist. LEXIS 50315 (S.D. Fla. Apr. 13, 2016) ............. 15, 20

*Morgan v. Pub. Storage*,
    No. 14-cv-21559, 2016 U.S. Dist. LEXIS 54937 (S.D. Fla. Mar. 9, 2016) ..................... 13

*Nelson v. Mead Johnson & Johnson Co.*,
    484 F. App'x 429 (11th Cir. 2012) ............................................................. 15

*Ressler v. Jacobson*,
    822 F. Supp. 1551 (M.D. Fla. 1992) ...................................................... 16, 19

*Stapleton v. Tampa Bay Surgery Ctr., Inc.*,
    No. 8:17-cv-1540-T-30AEP, 2017 U.S. Dist. LEXIS 139661 (M.D. Fla. Aug. 30, 2017) ................................................................................................. 18

*Terrill v. Electrolux Home Prods.*,
    295 F.R.D. 671 (S.D. Ga. 2013) .................................................................. 24

*Torres v. Bank of Am. (In re Checking Account)*,
    830 F.Supp.2d 1330 (S.D. Fla. 2011) ................................................... passim

*Warren v. City of Tampa*,
    693 F. Supp. 1051 (M.D. Fla. 1988) ................................................ 14, 16, 22

*Williams v. Nat'l Sec. Ins. Co.*,
    237 F.R.D. 685 (M.D. Ala. 2006) ................................................................ 20

*Wilson v. Everbank*,
    No. 14-CIV-22264, 2016 U.S. Dist. LEXIS 15751 (S.D. Fla. Feb. 3, 2016) .................. 13

## RULES

Federal Rule of Civil Procedure 23 ...................................................... passim

## I.      INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 23(e), Plaintiffs and Settlement Class Representatives Andrew Giancola, Raymond T. Scott, and Patricia Smith respectfully submit this Unopposed Motion for Final Approval of Class Action Settlement and Incorporated Memorandum of Law (the "Motion") and hereby request entry of the proposed Final Judgment and Order of Dismissal with Prejudice ("Final Approval Order"), submitted herewith as **Exhibit A**[1].  On May 22, 2018, this Court granted preliminary approval of the Settlement ("Preliminary Approval Order"), and approved Notice of the Settlement to the Class, which has been duly provided.  (*See* Dkt. No. 42)  Settlement Class Representatives now request that the Court grant final approval of the Settlement which, importantly, has garnered *zero* objections from Class Members.[2]

As set forth herein, the Settlement reached by the Parties represents an excellent result for Class Members impacted by the Phishing Attack that spurred this Litigation[3].   Indeed, the Settlement provides substantial and meaningful relief to the Class in the form of: (i) direct monetary relief from the Settlement Fund; (ii) premium Credit and Identity Monitoring and Protection services; (iii) Enhanced Data Security Measures; and (iv) Additional Benefits to the Class.   These meaningful class-wide benefits weigh strongly in favor of final approval of the Settlement, particularly when considered against the significant risk that the Class could potentially recover much less (or even nothing at all) if this case continued to be litigated through

---

[1] Plaintiffs will update the Final Approval Order with all exclusions prior to the Final Approval Hearing on October 25, 2018.

[2] The Parties include Plaintiffs and Defendant Lincare Holdings Inc. ("Defendant" or "Lincare"). Plaintiffs conferred with Defendant, as required, pursuant to Local Rule 3.01(g) concerning the relief requested herein, and Defendant does not oppose this Motion or the relief it requests.

[3] Unless otherwise noted, all capitalized terms used herein have the meanings ascribed to them in the Settlement Agreement, and/or the Supplemental Fee Agreement.  In addition, all emphasis is added and all citations are omitted, unless otherwise noted.

motions to dismiss, class certification, summary judgment, trial, and the appeals that would likely follow—a process that could last many additional months, if not years.  (Declaration of Michael I. Fistel, Jr. ("Fistel Dec.") at ¶6)  In light of the relative strengths and weaknesses of this case, the serious and unresolved disputes remaining among the Parties, and the time and expense of ongoing Litigation, the Settlement is fair, reasonable, and adequate, and Class Counsel and the Settlement Class Representatives have readily concluded that the Settlement is in the best interests of the Class.  (*Id.* & Exs. 4, 5, and 6[4])

Crucially, the Parties reached the Settlement only after engaging in months of good-faith, arm's-length settlement negotiations, under the guidance of a well-respected and experienced mediator.  Based on his extensive interactions with the Parties, the mediator, Stephen R. Jaffe, Esq., has praised the Settlement as "a fair and non-collusive settlement that was conducted at arm's length by skilled, well-informed lawyers with sufficient discovery and investigation prior to completion of the mediation, and through the intense, lengthy mediation process," which accordingly is "fair, reasonable, and adequate for Class Members."  (Jaffe Dec. at ¶17)

Further, the overwhelmingly positive reaction of the Class serves as compelling support for the Settlement.  In accordance with the Preliminary Approval Order, Notice of the Settlement was provided to 2,028 potential Class Members via direct Mail Notice, starting on June 21, 2018. (Epiq Aff.[5] at ¶4)  Also, on that date, the Settlement Administrator posted information about the Settlement on a dedicated Settlement Website, as well as established a dedicated toll-free Telephone Hotline.  (*Id.* at ¶¶5–6)  And, while the objection deadline has not yet passed, ***none*** of

---

[4] Declarations of each Settlement Class Representative are attached as exhibits to the Fistel Dec.
[5] The Epiq Affidavit, or Epiq Aff., refers to the affidavit of Epiq project manager Nancy Hesemann regarding completion of the Notice Program, and is attached as Exhibit 1 to the Fistel Dec.

the **2,032** Class Members have filed objections to any aspect of the Settlement.[6]  (Fistel Dec. at ¶48)  The lack of opposition thus far supports Settlement Class Representatives' decision to resolve the Litigation in exchange for the proposed class-wide relief, and weighs in favor of a finding that the Settlement is fair, reasonable, and adequate.

For the reasons set forth herein, Settlement Class Representatives respectfully request that the Court grant final approval of the Settlement.

## II.    SUMMARY OF THE LITIGATION AND SETTLEMENT PROCEEDINGS

### A.    The Litigation

Before filing the Litigation, Class Counsel extensively researched the facts and law surrounding the Phishing Attack and Plaintiffs' claims, including *inter alia*: investigating Lincare's response to the Phishing Attack, and Lincare's data security practices; reviewing data security industry practices; researching other data breach litigation nationwide; and analyzing the law of several states and jurisdictions.[7]  (Fistel Dec. at ¶14)

On October 16, 2017, Plaintiffs initiated this Litigation by filing a detailed 55-page Complaint ("Complaint" or "Compl."), asserting claims against Lincare for negligence, breach of fiduciary duty, breach of implied contract, and violation of Florida's Deceptive and Unfair Trade Practices Act.  (Dkt. No. 1)  The Complaint asserted claims on behalf of Plaintiffs and a class of "[a]ll current and former employees of Lincare who, during the period beginning on or about February 10, 2017 and continuing through the present, had their PII, including names, addresses,

---

[6] The deadline for Class Members to object to or request exclusion from the Settlement is August 20, 2018, and thus has not yet passed.  If any timely objections are received, Class Counsel will address them in a reply memorandum due no later than October 18, 2018.  (*See* Dkt. No. 42)

[7] To avoid repetition, the Court is respectfully referred to the Fistel Dec. for a full discussion of the factual and procedural history of the Litigation, the background of the claims asserted, Settlement Class Representatives' investigation and discovery, and the negotiations leading to the Settlement, all of which support final approval of the Settlement.

social security numbers, and/or W-2 information, wrongfully and voluntarily disseminated by Lincare to a third party or parties."  (Compl. at ¶106)  The Complaint made detailed factual allegations concerning Lincare's data security practices, the Phishing Attack, Lincare's post-Phishing Attack conduct, and the experiences of each Plaintiff, including the damages they suffered in connection with the Phishing Attack.  (*See generally id.*)

On December 11, 2017, Lincare moved to dismiss the Complaint in its entirety, arguing lack of Article III standing and failure to state any claim for relief, as well as to strike certain allegations.  (Dkt. No. 25)  Subsequently, on December 29, 2017, Plaintiffs filed the operative Amended Complaint ("Amended Complaint" or "Am. Compl."), which mooted Defendant's dismissal motion.  (*See* Dkt. Nos. 26, 27)

Before Lincare responded to the Amended Complaint, the Court granted a stay of the Litigation, so the Parties could participate in mediation.  (Dkt. Nos. 30, 31)  Following mediation, on February 20, 2018, the Parties reached an agreement-in-principal to resolve the Litigation. While the Parties were negotiating the final terms of the Agreement, the stay expired, and the Litigation returned to active status on March 21, 2018.  (Dkt. Nos. 33, 34)  Thereafter, on April 11, 2018, Lincare moved to dismiss the Amended Complaint (Dkt. No. 36), Plaintiffs' response to which was due by May 9, 2018, and a hearing was set thereupon for May 14, 2018.  (Dkt. No. 37) On May 1, 2018, following notification from the Parties that a settlement had been reached, the Court denied Defendant's pending dismissal motion, again as moot.  (Dkt. No. 38)

## B.    Discovery

The Parties promptly commenced discovery to investigate the facts and law underlying the Litigation.  Plaintiffs served interrogatories and two separate document requests on Lincare, to which Lincare answered with written objections and responses.  Plaintiffs also served on Lincare a notice of Rule 30(b)(6) deposition.  (Fistel Dec. at ¶19)  Lincare also served interrogatories and

– 4 –

document requests on all three Plaintiffs, to which Plaintiffs answered with written objections, responses, and production of documents. (*Id.*) The Parties subsequently met and conferred multiple times to negotiate, *inter alia*, the scope of requests, production of documents, and search terms. (*Id.*) Lincare also agreed to a rolling production of documents, pursuant to which it initially produced hundreds of documents in response to certain of Plaintiffs' discovery requests. (*Id.*)

### C.    The Negotiations Leading to Settlement and the Preliminary Approval of Settlement

Throughout this case, Class Counsel held several discussions with Lincare regarding the merits of the claims. (Fistel Dec. at ¶20) While engaged in discovery, the Parties agreed to participate in a mediation with Steven R. Jaffe, Esq., of Upchurch Watson White & Max Mediation Group, which was held on February 20, 2018, in Tampa, Florida. (*Id.*) Mr. Jaffe is a highly respected and experienced mediator, with extensive experience in class action and data breach litigation. (Jaffe Dec. at ¶¶2–7; *see also* Fistel Dec. at ¶20)

In advance of mediation, the Parties held separate telephonic sessions with, and prepared and submitted detailed mediation statements to, Mr. Jaffe. (Jaffe Dec. at ¶9; *see also* Fistel Dec. at ¶21) On February 20, 2018, the Parties participated in a 15-hour, in-person mediation session with Mr. Jaffe, ultimately agreeing in-principle as to the relief and structure of a proposed settlement. (Jaffe Dec. at ¶10; *see also* Fistel Dec. at ¶21) Upon concluding mediation, the Parties agreed to continue negotiating the remaining settlement terms in good faith, and to negotiate and draft a comprehensive settlement agreement and related documents. (Jaffe Dec. at ¶¶10, 13; *see also* Fistel Dec. at ¶21) Accordingly, between February 20, 2018 and May 11, 2018, the Parties continued to negotiate the terms of the Settlement, culminating in execution of the Agreement on May 14, 2018. (Jaffe Dec. at ¶13; Fistel Dec. at ¶21)

– 5 –

Following agreement on all material terms of the Settlement, the Parties entered into negotiations, aided throughout by Mr. Jaffe, regarding Lincare's payment of Service Awards for the Settlement Class Representatives, and the Fee and Expense Award for Class Counsel.  (Dkt. No. 40 at ¶¶65, 66; Jaffe Dec. at ¶14; Fistel Dec. at ¶22)  These arm's-length negotiations resulted in an agreement as to the Service Awards—namely, $1,000 for each Settlement Class Representative—prior to execution and filing of the Settlement.  (Dkt. No. 40 at ¶65; Fistel Dec. at ¶22)  Then, as a result of the Parties' continued arm's-length and often adversarial negotiations guided by Mr. Jaffe, the Parties ultimately reached and drafted, and on June 12, 2018 executed, an agreement as to the Fee and Expense Award.  (Jaffe Dec. at ¶¶14–15; Fistel Dec. at ¶22)

Upon finalizing and executing the Settlement, Plaintiffs filed an Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement ("Preliminary Approval Motion"), along with the Settlement Agreement and other related exhibits, on May 14, 2018.  (*See* Dkt. Nos. 39–41-2)  On May 22, 2018, the Court entered the Preliminary Approval Order.

## III.    TERMS OF THE PROPOSED SETTLEMENT

### A.  The Settlement Class

The Settlement Class, as preliminarily approved by the Court for settlement purposes, is defined as follows:

> All current and former employees of Lincare Holdings Inc., including its subsidiaries and affiliated companies, who, on or about February 3, 2017, had their personally-identifiable information, including names, addresses, social security numbers, and/or W-2 information, compromised and/or disseminated by Lincare to a third-party or parties, without authorization or consent.

(Dkt. No. 40 at ¶26; Dkt. No. 42)

– 6 –

**B.    The Direct Settlement Benefits for the Class**

    **1.    The Settlement Fund**

The Settlement provides direct and valuable economic relief to Class Members who were impacted by the Phishing Attack.  In consideration for the Settlement Class Members' release of claims (Dkt. No. 40 at §XI), Lincare has agreed to establish a Settlement Fund totaling $875,000 that will be used to pay "Out-of-Pocket Loss Claims" and "Eligible Incidents Claims."  (*Id.* at ¶¶33–34)  Class Members are entitled to receive payment for Out-of-Pocket Loss Claims ***or*** Eligible Incidents Claims, but not for both.  (*Id.* at ¶37)  For Out-of-Pocket Loss Claims, there is an aggregate of $550,000 available to eligible Class Members seeking payment of up to $1,000 for previously unreimbursed charges and expenses fairly traceable to the Phishing Attack ("Out-of-Pocket Losses").  (*Id.* at ¶¶14, 37(a))  Before submitting an Out-of-Pocket Loss Claim, a Class Member must first submit a claim for reimbursement from the InfoArmor identity theft insurance that Lincare previously provided to impacted employees after the Phishing Attack.  (*Id.*)

The Settlement Fund also allocates an aggregate of $325,000 for Class Members seeking payment for "Eligible Incidents" of identity theft that are fairly traceable to the Phishing Attack. (*Id.* at ¶¶6, 37(b))  Eligible Incidents for which Class Members may seek payment under the Settlement include: (i) the filing of a fraudulent tax return using a Class Member's name or PII; (ii) the opening of a fraudulent loan (including, for example, a mortgage or student loan) using a Class Member's name or PII; (iii) the opening of a fraudulent credit card using a Class Member's name or PII; and (iv) the filing of a fraudulent/false unemployment claim using a Class Member's name or PII, with an aggregate of $325,000 in such compensation available to the Settlement Class. (*Id.*)  Payments for Eligible Incidents Claims are capped at $500 per each Eligible Incident, and a Class Member may submit a maximum of two Eligible Incident Claims.  (*Id* at ¶37(b))

Once the Settlement Administrator has reviewed and approved valid Out-of-Pocket Loss Claims and Eligible Incidents Claims and determined any *pro rata* adjustment, the Settlement Administrator issues payment from the Settlement Fund as mailed checks to Class Members, as per the Agreement and the Distribution and Allocation Plan.  (*Id.* at ¶¶37, 43; Dkt. No. 40-4)

### 2. Enhanced Credit and Identity Monitoring and Protection Services Through TransUnion

The Settlement provides that, beginning on February 1, 2019 (*i.e.*, at the expiration of the InfoArmor services that Lincare previously made available to Class Members), Lincare will make available to all Settlement Class Members two additional years of complimentary Credit and Identity Monitoring and Protection through TransUnion's "MyTrueIdentity" package, which includes, among many other important benefits: $1,000,000 of deductible-free identity theft insurance; comprehensive identity monitoring; access to an identity restoration program; access to credit, identity, and insurance specialists; comprehensive 3-bureau credit monitoring and alerts; access to TransUnion credit lock; and online credit dispute access.  (Dkt. No. 40 at ¶35)  Lincare will pay the costs of these TransUnion services separate from and in addition to all other consideration and relief provided or offered by Lincare as part of the Settlement.  (*Id.*)

### 3. Enhanced Data Security Measures

Under the Settlement, Lincare has implemented, and/or has agreed to implement, and agrees to maintain, the following Enhanced Data Security Measures to protect the Personally Identifiable Information of its employees and former employees:

a. <u>Data Risk Assessment</u>. Lincare performs, and will continue to perform, an external HIPAA Risk Assessment at least every two (2) years, as well as an Annual Risk Analysis, that identifies material internal and external risks to the security of employees' Personally Identifiable Information stored on Lincare's systems.

b. <u>Head of Information Technology ("IT")</u>. Lincare will continue to maintain a Head of IT to coordinate and be responsible for the company's program(s) to protect the security of employees' Personally Identifiable Information. The Head of IT shall also be

responsible for implementing and monitoring the company's data security incident response program(s). The Head of IT shall have training on pertinent cybersecurity, risk management, and data breach and security incident response issues.

c. <u>Updated Spam Filter</u>. Lincare has implemented, and will continue to implement and maintain, an updated spam filter to assist in distinguishing valid and forged emails and preventing the dissemination of personal and confidential information to unauthorized third-parties. The company's spam filter includes: (i) spam filtering for company emails; (ii) Web and internet filtering to secure the company's network from harmful websites and malware; and (iii) mechanisms to automatically report phishing activity, including EXTERNAL notifications within email subject lines.

d. <u>Email Notifications</u>. Lincare has implemented, and will continue to implement and maintain, updated email tags to assist in distinguishing emails emanating from external sources.

e. <u>Employee Education</u>. Lincare has provided and will continue to provide training and/or guidance to educate its workforce on an annual basis concerning the following: (i) information security issues; (ii) privacy awareness and the importance of protecting Personally Identifiable Information; and (iii) the importance of identifying and avoiding phishing scams.

(Dkt. No. 40 at ¶36) The Enhanced Data Security Measures constitute a meaningful and valuable benefit to Class Members, ensuring the safety of their PII going forward. (Fistel Dec. at ¶35)

## C. The Costs of Notice and Administration

Lincare agreed to pay all costs associated with Notice and Claims administration, separate from and in addition to all other Settlement benefits. (Dkt. No. 40 at ¶¶33, 48, 56)

## D. Service Awards

Class Counsel will request, and Lincare agreed not to oppose, Service Awards of $1,000 for each Settlement Class Representative, in recognition of their efforts and diligence in pursuing the Litigation on behalf of the Settlement Class. (Dkt. No. 40 at ¶¶33, 65) Any Court-approved Service Awards will be paid by Lincare separate from and in addition to all other consideration and relief offered or provided by Lincare as part of the Settlement. (*Id.*)

### E.   Attorneys' Fees and Expenses

In consideration of the benefits obtained for and conferred upon Plaintiffs and the Settlement Class in the Litigation, Lincare agreed to pay Class Counsel its reasonable attorneys' fees and expenses incurred in connection with the Litigation ("Fee and Expense Award").  (Dkt. No. 40 at ¶¶33, 66)  The Court-approved Fee and Expense Award will be paid by Lincare separate from and in addition to all other consideration, benefits, and relief offered or provided by Lincare to the Settlement Class as part of the Settlement.  (*Id.*)  Pursuant to the terms of the Supplemental Fee Agreement, Lincare has agreed that Class Counsel may seek, and Lincare will not oppose Class Counsel's request for, a Fee and Expense Award in an amount not to exceed $475,000.

### F.   Release

As consideration and in exchange for the Settlement benefits, the Settlement Class Representatives and their Counsel, and the Settlement Class Members, as of the Effective Date, shall fully release and forever discharge Lincare and all of its affiliates set forth in the Agreement, of any and all liabilities, rights, claims, actions, causes of action, demands, damages, penalties, costs, attorneys' fees, losses, and remedies, whether known or unknown, existing or potential, suspected or unsuspected, liquidated or unliquidated, legal, statutory, or equitable, that result from, arise out of, are based upon, or relate to the Phishing Attack that were or could have been alleged in the Litigation, including, without limitation, any claims, actions, causes of action, demands, damages, penalties, losses, or remedies relating to, based upon, resulting from, or arising out of: (1) the theft, exposure, or disclosure of Settlement Class Members' PII; (2) Lincare's maintenance, retention, storage, and destruction of Settlement Class Members' PII; (3) Lincare's information security policies, procedures, and practices or training; and (4) Lincare's notice of the Phishing Attack to Settlement Class Members.  (Dkt. No. 40 at ¶¶33, 60–61, 64)  In turn, Lincare will release

Settlement Class Representatives and their Counsel from any claims related to the institution, prosecution, and settlement of the Litigation.  (*Id.* at ¶¶62–64)

### G.    Implementation of the Notice Program and Claims Process

Consistent with the Notice Program previously approved by the Court (*see* Dkt. No. 42), the Settlement Administrator effectuated the three primary Notice components: (1) Mail Notice, (2) creation of a Telephone Hotline and corresponding call center for Settlement Class Members, and (3) Notice posted on a Settlement Website.  (Dkt. No. 40 at ¶¶11, 50; Epiq Aff. at ¶¶2–6)  On June 21, 2018, the Settlement Administrator initiated the Notice Program, including by completing the Mail Notice component of the Notice Program through the direct mailing of Notice to the last known addresses of 2,028 Class Members.  (Epiq Aff. at ¶¶2–4)  The Settlement Administrator has made and/or will continue to make follow-up efforts to reach Class Members whose Notices are returned as undeliverable.  (Dkt. No. 40 at ¶50)

Also, on June 21, 2018, the Settlement Administrator effectuated the Telephone Hotline component of the Notice Program by establishing a toll-free number (855) 349-6391, through which Class Members may obtain Notice of and information regarding the Settlement, as well as request a mailed copy of Claim Forms.  (Epiq Aff. at ¶5)

Finally, the Settlement Administrator completed the Settlement Website component of the Notice Program on June 21, 2018 by establishing a website, www.LHIsettlement.com, accessible to Class Members using unique login credentials provided to each of them, providing a means for Class Members to submit Claims, and obtain Notice of and information about the Settlement, including through hyperlinked access to the Agreement, Notice, other settlement-related documents, and pertinent pleadings.  (Epiq Aff. at ¶6; Dkt. No. 40 at ¶24)  The Settlement Website also allows Class Members to obtain information concerning the process for objection and

exclusion, including the time and method for objecting or requesting exclusion and that Class Members may make an appearance through counsel.  (*Id.*)

As of July 13, 2018, 2018, direct mailing of Notice had been sent to 2,062 Class Members, there were 73 callers to the Telephone Hotline, and the Settlement Website had been visited 1,687 times.  (Fistel Dec. at ¶¶46-47)  Importantly, despite this robust Notice Program, to-date, **no** Class Members have objected to the Settlement.  (Fistel Dec. at ¶48)

## IV.     ARGUMENT

### A. Applicable Standards Generally Favor Approval of Class Action Settlements

"Federal courts have long recognized a strong policy and presumption in favor of class action settlements."  *Torres v. Bank of Am.* (*In re Checking Account*), 830 F.Supp.2d 1330, 1341 (S.D. Fla. 2011); *see also Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) (recognizing "strong judicial policy favoring settlement" and "that compromise is the essence of settlement").  Rule 23(e) requires courts to determine if a settlement is "fair, adequate, reasonable, and not the product of collusion."  *Leverso v. SouthTrust Bank of Ala., Nat'l. Ass'n.*, 18 F.3d 1527, 1530 (11th Cir. 1994).  In so determining, the Court "will not substitute its business judgment for that of the parties; 'the only question . . . is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.'"  *In re Checking Account*, 830 F.Supp.2d at 1341.

### B.     The Settlement Is Fair, Reasonable, and Adequate, and Thus Warrants Approval

In determining whether a class settlement is fair, adequate, and reasonable, courts in this Circuit typically evaluate the following six factors: "(1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of the [p]laintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of class counsel, the

class representatives, and the substance and amount of opposition to the settlement." *Leverso*, 18 F.3d at 1530 & n.6; *see Bennett*, 737 F.2d at 986. Taken together, consideration of these factors demonstrates that the Settlement here is fair, reasonable, and adequate, and warrants final approval.

### 1.    The Settlement Occurred at Arm's Length

"Where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion." *Wilson v. Everbank*, No. 14-CIV-22264, 2016 U.S. Dist. LEXIS 15751, *22–23 (S.D. Fla. Feb. 3, 2016). Here, the Settlement was the product of protracted, arm's-length negotiations, overseen by a respected and experienced mediator, Mr. Jaffe, who has confirmed the non-collusive nature of the Settlement. (Jaffe Dec. at ¶¶11, 17) *See Morgan v. Pub. Storage*, No. 14-cv-21559, 2016 U.S. Dist. LEXIS 54937, at *17 (S.D. Fla. Mar. 9, 2016) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive."). Indeed, "[t]he very fact of [Mr. Jaffe's] involvement—let alone his sworn declaration—weighs in favor of approval." *Wilson*, 2016 U.S. Dist. LEXIS 15751, at *23.

Notably, the Settlement was reached only after the Parties engaged in hard-fought, often contentious negotiations that occurred over a period of months, which included countless email and phone communications between the Parties' counsel and a 15-hour, in-person mediation with Mr. Jaffe. (Jaffe Dec. at ¶¶10–11; Fistel Dec. at ¶51) The Parties spent months intensely negotiating every detail of the Agreement, with the continued guidance from Mr. Jaffe. (Jaffe Dec. at ¶¶11, 13; Fistel Dec. at ¶51) The Parties did not begin negotiating the Service Awards or the Fee and Expense Award at the mediation, or at any time prior to agreeing to all essential terms of the Settlement. (Jaffe Dec. at ¶¶12, 14; Fistel Dec. at ¶55)

Moreover, prior to reaching the Settlement, the Parties actively litigated this case, and the claims and defenses were the subject of much dispute. Since the filing of the Complaint in October 2017, the Litigation has been contentious, as the Parties were involved in multiple motion to

dismiss proceedings, engaged in preliminary discovery, and on the brink of briefing the issue of class certification.  (Fistel Dec. at ¶54)  This adversarial history alone demonstrates the Settlement was not collusive.  *See In re Checking Account*, 830 F. Supp. 2d at 1345 (absent contrary evidence, "the Court readily concludes that there was no fraud or collusion leading to this Settlement"); *Warren v. City of Tampa*, 693 F. Supp. 1051, 1055 (M.D. Fla. 1988) (record showed no evidence of collusion, but rather "that the parties conducted discovery and negotiated the terms of settlement for an extended period of time"), *aff'd*, 893 F.2d 347 (11th Cir. 1989).

### 2.    The Settlement Will Avert Complex, Protracted, and Expensive Litigation

The Parties here have expended considerable resources in litigating this putative class action matter, which involves complicated and novel issues relating to, *inter alia*, data privacy law, standing, causation, and damages.  (Fistel Dec. at ¶57)  If not through settlement, resolution of the action would invariably require the Parties to engage in many more months, if not years, of additional litigation.  *See In re Checking Account*, 830 F.Supp.2d at 1345 ("although this litigation has been pending for more than two years, recovery by any means other than settlement would require additional years of litigation in this Court and the appellate courts").  Specifically, had no settlement been reached, the Parties would move forward with class discovery and briefing on Defendant's dismissal motion, followed by briefing on class certification, then merits discovery, summary judgment, *Daubert* challenges, a lengthy trial, and potential appeals.  During this lengthy, drawn-out process, the Parties would undoubtedly incur millions of dollars in fees and out-of-pocket expenses, the Court would spend its own resources, and meanwhile, Class Members would be left without any relief.  *See In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) (noting complex litigation "can occupy a court's docket for years on end, depleting the resources of the parties and taxpayers while rendering meaningful relief increasingly elusive").

– 14 –

In contrast, this Settlement conclusively resolves this Litigation, saves the Parties and Court considerable time, effort, and money, and provides immediate and substantial relief to the Class. *See Montoya v. PNC Bank, N.A.*, No. 14-cv-20474, 2016 U.S. Dist. LEXIS 50315, at *31 (S.D. Fla. Apr. 13, 2016) ("There was nothing to be gained from litigating the complex claims presented for years more; doing so would only have cost the Court, the parties, and absent class members valuable time, resources, and money."). As the Settlement offers meaningful and direct Class-wide relief, in contrast with the alternative of "protracted and expensive litigation" with "the mere possibility of relief in the future," the fairness and adequacy of the Settlement cannot be reasonably disputed. *In re Checking Account*, 830 F.Supp.2d at 1345–46.

### 3. The Factual Record is Sufficiently Developed to Enable Class Counsel to Make a Reasoned Judgment Regarding the Litigation and the Settlement

Courts also consider "the degree of case development that class counsel have accomplished prior to settlement" to ensure that "counsel had an adequate appreciation of the merits of the case before negotiating." *In re Checking Account*, 830 F. Supp. 2d at 1349. As part of this assessment, "[t]he law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Id.*

Class Counsel, who have considerable experience litigating complex class action matters, made a concerted effort to evaluate the strengths and weaknesses of the case, and ultimately, the merits of settlement. (Fistel Dec. at ¶60) *See Nelson v. Mead Johnson & Johnson Co.*, 484 F. App'x 429, 434 (11th Cir. 2012) ("In considering the settlement, the district court may rely upon the judgment of experienced counsel for the parties."). Class Counsel's efforts here included, *inter alia*: (i) conducting a fulsome, pre-suit investigation into the Phishing Attack; (ii) analyzing the laws of several states and jurisdictions relating to data breach and consumer privacy; (iii) consulting with an expert on data, cybersecurity, and consumer privacy issues; (iv) engaging

in and reviewing discovery related to class certification; (v) reviewing additional information produced by Lincare during the mediation process; (vi) analyzing and preparing responses to Defendant's motions to dismiss, including extensively researching issues concerning liability, causation, standing, class certification, and damages; (vii) preparing and submitting comprehensive mediation papers analyzing the factual and legal issues; and (viii) participating in mediation and subsequent, hard-fought settlement negotiations. (*Id.* at ¶61; *see also* Jaffe Dec. at ¶¶10–11, 13) *See In re Checking Account*, 830 F. Supp. 2d at 1349 ("According to Class Counsel's uncontested statement of facts, significant investigation and discovery occurred in this case prior to the Settlement. That was sufficient to give Settlement Class Counsel insight into the strengths and weaknesses of their claims . . . ."). Through these efforts, Class Counsel were able to make a reasoned judgment about the merits of the Litigation, and "were more than sufficiently prepared to negotiate and enter into the Settlement." (Jaffe Dec. at ¶17; Fistel Dec. at ¶63) *See id.*

### 4.     Plaintiffs Faced Meaningful Obstacles to Success

A settlement is fair, reasonable, and adequate if the class' interests, as a whole, are better served settling, rather than pursuing, the litigation. *Ressler v. Jacobson*, 822 F. Supp. 1551, 1556 (M.D. Fla. 1992). A critical factor in assessing whether the class is better served through settlement is the probability of success if the case were tried. *See id.* at 1555; *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297, 314 (N.D. Ga 1993). The Court's role in assessing this factor is not to decide the case, but rather to conduct "a limited inquiry into whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of the settlement." *Ressler*, 822 F. Supp. at 1552–53. In this inquiry, courts give "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation." *Warren*, 693 F. Supp. at 1060; *see also In re Domestic Air*, 148 F.R.D. at 312–13.

– 16 –

While Plaintiffs and their counsel were confident in the merits of their claims, there was certainly no guarantee they ultimately would have achieved *more* success in litigating the case through trial.  Indeed, had no settlement been achieved, Plaintiffs and the Class would continue to face enormous risks, which include: (i) losing at the motion to dismiss stage; (ii) failing to obtain class certification; (iii) failing to obtain evidence to support their claims and then losing at the summary judgment stage; (iv) having their experts disqualified under *Daubert* or key evidence deemed inadmissible; and (v) losing at trial, or receiving an adverse or nominal jury verdict.  (Fistel Dec. at ¶65)  And even if Plaintiffs and the Class were able to clear these legal hurdles and prevail at trial, they still would face the likelihood of appeals and the possibility that the Eleventh Circuit could reverse any favorable outcome achieved below.  (*Id*.)

The substantial litigation risks faced by Plaintiffs were highlighted in the unresolved motions to dismiss filed by Lincare.  Lincare argued therein that Plaintiffs failed to plead sufficient facts concerning causation, an essential element of their claims.  (Dkt. No. 36 at pp. 7–19)  Lincare also averred Plaintiff Scott lacks standing because his injuries are too speculative and abstract, and moreover "symptomatic of a larger issue plaguing the class because all class members similarly situated to Scott also lack Article III standing."  (*Id*. at pp. 19–26)  Plaintiffs believe they would have been able to overcome dismissal, but the legal authority on these issues is not conclusive, and success was not guaranteed.  *See Burrows v. Purchasing Power, LLC*, No. 12-cv-22800, 2013 U.S. Dist. LEXIS 189397, at *14 (S.D. Fla. Oct. 4, 2013) (emphasizing that "the Court finds that Plaintiff's likelihood of success is not certain in this case" given that "the issues of causation and damages were tremendous challenges," in finally approving data breach settlement).

The extent of the risk faced in this Litigation is further illustrated by the opinion of Judge Gale of the District of Kansas in the *Carecentrix* data breach class action, which acknowledged the specific challenges in data breach cases:

> The Novelty and Difficulty of the Questions: Again, the motion to dismiss briefing and multiple discovery disputes in this case evidenced the novelty of the questions that would play a key role in this case. These questions include (a) Article III standing for data breach victims; (b) the duty of care owed by an employer to its employees when collecting and storing their W-2 Form information; (c) whether a defendant may obtain absent class member discovery in a data breach case; (d) what type of damages are available at trial; and (e) whether Plaintiff [] could obtain class certification of a class of data breach victims (an issue of first impression in the Tenth Circuit).

*Hapka v. Carecentrix, Inc.*, No. 16-cv-2372, 2018 U.S. Dist. LEXIS 68186, at *6 (D. Kan. Feb. 15, 2018). And, yet another district court has gone on to say in a data breach case that individualized issues of injury, causation, and damage may defeat class certification. *See In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21, 33 (D. Me. 2013) (predominance was not satisfied due to concern over "a trial involving individual issues for each class member as to what happened to his/her data and account, what he/she did about it, and why").

Other notable risks and obstacles posed in this Litigation include that fact data breach litigation presents legal issues well-recognized by courts to be novel and complex,[8] and

---

[8] As explained by Judge Moody of this District:

> The issue of whether a data breach on its own is an "injury in fact" is novel for this Court and has not been addressed by the Eleventh Circuit. Other circuit courts have reached conflicting conclusions, with the Sixth, Seventh, Ninth, and D.C. Circuits holding data breach victims have standing because they are at a substantial risk of injury, and the First, Second, Third, and Fourth Circuits holding data breach victims lacked standing. So there is no clear consensus as to how the issue should be resolved.

*Stapleton v. Tampa Bay Surgery Ctr., Inc.*, No. 8:17-cv-1540-T-30AEP, 2017 U.S. Dist. LEXIS 139661, at *4–5 (M.D. Fla. Aug. 30, 2017).

Defendant's likely assertion that Plaintiffs' claims are subject to a class action waiver provision in their employment agreements with Lincare.[9]

Based on the many risks faced by Plaintiffs and the Class, the Settlement—which provides immediate and meaningful relief to Class Members—is undoubtedly a "fair compromise" worthy of final approval. *See Bennett v. Behring Corp.*, 96 F.R.D. 343, 349–50 (S.D. Fla. 1982), *aff'd*, 737 F.2d 982 (11th Cir. 1984).

> **5.** **The Benefits Provided by the Settlement Are Fair, Adequate, and Reasonable Compared to the Range of Possible Recoveries**

In determining whether a settlement is fair in light of the potential range of recovery, "the Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation, but rather, to evaluate the proposed settlement in its totality." *Figueroa v. Sharper Image Co.*, 517 F. Supp. 2d 1292, 1326 (S.D. Fla. 2007). Indeed, the Court is not called upon to decide whether Settlement Class Representatives reached the very best deal possible through the Settlement, or whether Class Members will receive as much therefrom as might by recovered at trial. *See Ressler*, 822 F. Supp. at 1552–53. This is because settlements must be evaluated "in light of the attendant risks with litigation." *In re Checking Account*, 830 F.Supp.2d at 1350. Thus, "a settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery," or where "[p]laintiffs have not received the optimal relief." *Id.* at 1350–1351.

The Settlement provides substantial value to the Class in the form of monetary benefits and injunctive relief, and as such, readily passes muster. *See Figueroa*, 517 F. Supp. 2d at 1326. **First**, the Settlement establishes a Settlement Fund, through which Class Members may submit a Claim of up to $1,000 for Out-of-Pocket Losses, or Eligible Incidents of identity theft or fraud, that are

---

[9] Settlement Class Representatives are confident that any such provisions would ultimately be found unenforceable and unconscionable under Florida law, but this argument nevertheless poses a significant risk to the ability to litigate this case on a class-wide basis. (Fistel Dec. at ¶69)

fairly traceable to the Phishing Attack.  (Dkt. No. 40 at ¶34)  In the aggregate, Class Members may recover a total of $875,000 under the Settlement Fund.  *Second*, all Class Members are entitled to receive 24 months of premium Credit and Identity Monitoring and Protection services through TransUnion (*id.* at ¶35), providing an additional benefit to the Class worth more than $972,900.[10] *Third*, the Settlement provides for specific enhancements and improvements to Lincare's data security practices (*id.* at ¶36), which further benefit Class Members by safeguarding their PII against future data and privacy breaches, thereby providing further relief to the Class under the Settlement.  (Fistel Dec. at ¶74)  *See Montoya*, 2016 U.S. Dist. LEXIS 50315, at *48 ("[C]ourts rightly consider the value of injunctive and monetary relief in assessing whether a class action settlement provides sufficient relief to the class."); *see also In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968 n.6 (8th Cir. 2018) (noting "the injunctive relief offered under the settlement has value to all class members," in affirming final approval of data breach settlement).

And, critically, the foregoing Settlement benefits are exclusive of the costs of Notice and Claims Administration, the Service Awards for Settlement Class Representatives, and the Fee and Expense Award for Class Counsel, all of which Lincare agreed to pay separate from and in addition to all other Settlement benefits.  (Dkt. No. 40 at ¶¶33, 34, 35, 48, 56, 65, 66)  As courts have noted, these additional expenses constitute class-wide benefits, and thus add to a settlement's value.  *See Williams v. Nat'l Sec. Ins. Co.*, 237 F.R.D. 685, 697 (M.D. Ala. 2006) (noting "[t]he benefit to the class also includes the $523,000 negotiated fee to class counsel and the thousands of dollars in costs incurred [] thus far in administering the settlement," and thus adding $900,000 to calculation of settlement's total value); *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No.

---

[10] The Credit and Identity Monitoring and Protection services available to Class Members as part of the Settlement, TransUnion "MyTrueIdentity" package, carries a retail value of approximately $19.95 per person, per month.  (Fistel Dec. at ¶32)

08-md-1998, 2009 U.S. Dist. LEXIS 119870, at *39-41 (W.D. Ky. Dec. 22, 2009) (highlighting in analysis of data breach settlement that "[t]he award of attorneys's fees in this case does not diminish the settlement class recovery, which provides a greater benefit to the class").

When considered on an average, "per class member" basis, the value of the class-wide relief afforded under this Settlement far exceeds the value of settlements reached in other, similar data breach class actions.  (Fistel Dec. at ¶77)  Indeed, the average recovery per Class Member recovery under the Settlement is approximately $909.41, at a minimum.[11]  As illustrated in the table below, the average recovery per-Class-Member here is many times greater than other notable data breach settlements deemed fair, reasonable, and adequate, and finally approved.

| Case | Approximate Value of Total Settlement Recovery | Class Size | Average Recovery Per-Class-Member |
|---|---|---|---|
| *Giancola, et al. v. Lincare Holdings Inc.*, No. 8:17-cv-02427-T-33AEP (M.D. Fla.) | $2,325,921.60 | 2,032 | **$1,144.65** |
| *In re Target Corp. Customer Data Sec. Breach Litig.*, No. 14-md-2522 (D. Minn.) | $17,000,000 | 80,000,000 | **$0.21** |
| *In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 14-md-2583 (N.D. Ga.) | $19,500,000 | 53,000,000 | **$0.37** |
| *In re Anthem, Inc. Data Breach Litig.*, No. 15-md-2617 (N.D. Cal.) | $115,000,000 | 78,800,000 | **$1.46** |
| *In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litig.*, No. 09-md-2046 (S.D. Tex.) | $3,030,962.50 | 100,000,000 | **$0.03** |
| *Burrows v. Purchasing Power, LLC*, No. 12-cv-22800 (S.D. Fla.) | $428,500 | 43,565 | **$9.84** |

Because the Settlement promptly resolves all Class Members' claims against Lincare, avoids protracted and expensive litigation that could lead to little or no recovery at all, and affords

---

[11] This estimate includes the $875,000 cash Settlement Fund relief (Dkt. No. 40 at ¶¶23, 34, 37), and $972,921.60 for the Credit and Identity Monitoring and Protection services (*i.e.*, $19.95 monthly retail value, per each of the 2,032 Class Members, over 24 months)—a total Class recovery of $1,847,921.60, or $909.41 per Class Member.  (Fistel Dec. at ¶77)  However, this calculus notably excludes the numerous other decidedly valuable Settlement benefits provided separately and additionally to the Class, such as the injunctive relief of Enhanced Data Security Measures, Fee and Expense Award to Class Counsel, Service Awards to the Settlement Class Representatives, and costs of Notice and Claims Administration.  (*Id.* at ¶78)

substantial, and immediate relief to the Class, the Settlement merits final approval.  *See, e.g.*, *Burrows*, 2013 U.S. Dist. LEXIS 189397 (finally approving data breach class settlement); *Target Corp. Customer Data Sec. Breach Litig.*, No. 14-md-2522 (D. Minn. May 12, 2016) (Dkt. No. 645) (finally approving data breach class settlement); *Winsouth Credit Union v. Mapco Express, Inc.*, No. 14-cv-1573 (M.D. Tenn. Jan. 12, 2017) (finally approving data breach class settlement).

      **6.**      **The Opinions of Class Counsel, Settlement Class Representatives, and Absent Class Members All Favor Approval of the Settlement**

The Settlement is enthusiastically endorsed by the experienced mediator and Class Counsel, which both strongly indicate the Settlement's fairness.  (Jaffe Dec. at ¶¶10–11, 17; Fistel Dec. at ¶81)  *See Warren*, 693 F. Supp. at 1060 (courts afford "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation").  Moreover, ***no*** Class Member has objected to the Settlement thus far, demonstrating overwhelming support from the Class as a whole.  *See Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005) (finding that a low percentage of objections "points to the reasonableness of a proposed settlement and supports its approval").

In sum, the application of the foregoing factors demonstrates that the Settlement is fair, adequate and reasonable, and that it should be finally approved by the Court.

      **C.**      **THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS**

In its Preliminary Approval Order, the Court preliminarily certified the Settlement Class as set forth in the Settlement Agreement.  (Dkt. No. 42)  Settlement Class Representatives now request the Court finally certify the Settlement Class for purposes of administering the Settlement.

The Settlement Class readily satisfies the four requirements of Rule 23(a).  ***First***, the Class, which is comprised of ***2,032*** members (Fistel Dec. at ¶33), is so numerous that joinder of all members is impracticable.  *See Coles v. Stateserv Med. of Fla., LLC*, No. 17-cv-829-T-17AEP,

2018 U.S. Dist. LEXIS 39393, at *7 (M.D. Fla. Mar. 5, 2018) (500-member class sufficiently numerous).  **Second**, there are numerous common questions of law and fact in this Litigation, including *inter alia*, (1) whether Lincare failed to act reasonably in protecting the PII of Plaintiffs and Class Members in its care, custody, and control; (2) whether Lincare's actions, and/or failures to act, caused the PII of Plaintiffs and Class Members to be stolen, accessed, and/or disseminated without authorization; and (3) whether Plaintiffs and Class Members are entitled to damages, and, if so, the nature thereof.  *See Countrywide*, 2009 U.S. Dist. LEXIS 119870, at *16–17 (commonality met where "[a]ll class members had their private information stored in Countrywide's databases at the time of the data breach").  **Third**, Settlement Class Representatives' claims are typical of and have a "sufficient nexus" to claims of other Class Members, as they all arise from the same Phishing Attack and Lincare's conduct in connection therewith, and assert the same legal theories.  *See Hines v. Widnall*, 334 F.3d 1253, 1256 (11th Cir. 2003).  **Fourth**, because Settlement Class Representatives have no interests antagonistic to those of other Class Members, and Class Counsel has the necessary qualifications and experience to lead the Litigation, they have and will continue to adequately and fairly protect the interests of the Class.  (Dkt. No. 42)  *See Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 258 F.R.D. 545, 555 (N.D. Ga. 2007).

The Settlement Class also satisfies the requirements of Rule 23(b)(3).  As courts have noted in data breach litigation, questions of law and fact common to all Class Members predominate over questions affecting only individual members where, as here, Plaintiffs allege a "common course of conduct" arising out of a data breach (*i.e.*, the Phishing Attack) which affects all Class Members in the same or substantially similar manner.  *See, e.g.*, *Countrywide*, 2009 U.S. Dist. LEXIS 119870, at *25–28 (predominance met where proof focuses on data breach defendant's conduct before and during the theft of class members' personal information); *In re Heartland*

*Payment Sys.*, 851 F. Supp. 2d 1040, 1059 (S.D. Tex. 2012) (predominance met where "several common questions of law and fact ar[ose] from a central issue: Heartland's conduct before, during, and following the data breach, and the resulting injury to each class member from that conduct"). Additionally, a class action is the superior method of adjudication, in that it best serves judicial economy to resolve the claims in this Litigation on a class-wide basis. *See Terrill v. Electrolux Home Prods.*, 295 F.R.D. 671, 697 (S.D. Ga. 2013) ("A single, coordinated proceeding is superior to hundreds of discrete and disjointed suits addressing the same facts and legal issues.").

Because the Settlement Class meets the requirements of Rules 23(a) and (b)(3), the Court should grant final certification of the Settlement Class.

### D.   THE NOTICE PROGRAM, AS IMPLEMENTED, SATISFIES DUE PROCESS AND RULE 23

Rule 23(c)(2) requires notice of a proposed class action settlement be provided to the class through "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also* Fed. R. Civ. P. 23(e)(1). However, "even in Rule 23(b)(3) class actions, due process does not require that class members actually receive notice." *Juris v. Inamed Corp.*, 685 F. 3d 1294, 1321 (11th Cir. 2012). To satisfy due process requirements, notice need only be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Jones v. Flowers*, 547 U.S. 220, 226 (2006).

In accordance with the Preliminary Approval Order, Epiq commenced mailing Notice to the last known mailing address of Class Members on June 21, 2018, sending out 2,028 Notices. (Epiq Aff. at ¶¶2–4) The Settlement Administrator has made and/or will continue to make follow-up efforts to reach Class Members whose Notices are returned as undeliverable. (Dkt. No. 40 at ¶50) The Settlement Administrator also established a Telephone Hotline and Settlement Website,

through which Class Members may obtain information about the Settlement, access Settlement documents, and submit Claims.  (Epiq Aff. at ¶¶5–6; Fistel Dec. at ¶¶8, 46-47)

The Notice mailed to Class Members provided the information required by Rule 23(c)(2)(b), including: (i) an explanation of the nature of the Litigation and the claims asserted; (ii) the definition of the Class certified by the Court; (iii) a description of the basic terms of the Settlement, including the nature of the settlement and the releases to be given; (iv) an explanation of the reasons why the parties are proposing the Settlement; (v) a statement indicating the attorneys' fees and expenses that will be sought; (vi) a description of Class Members' right to request exclusion from the Class or to object to the Settlement, and/or the requested attorneys' fees or expenses; and (vii) notice of the binding effect of a judgment on Class Members.  (*See* Dkt. Nos. 40-1, 40-2, 40-3)  The Notice also provided Class Members with information on how to submit a Claim, and the requirements to receive Settlement benefits, including cash payments and Credit and Identity Monitoring and Protection services.  (*Id.*)

This combination of individual mail to all Class Members who could be identified with reasonable effort, supplemented with notice provided on an Internet website and the establishment of a dedicated telephone hotline, is "the best notice . . . practicable under the circumstances" and satisfies the requirements of due process and Rule 23.  *See* Fed. R. Civ. P. 23(c)(2)(B); *Holman v. Student Loan Xpress, Inc.*, No. 08-cv-305-T-23MAP, 2009 U.S. Dist. LEXIS 113491, at *20 (M.D. Fla. Nov. 19, 2009) (approving notice by first class mail to most current known address).

## V.     CONCLUSION

For the foregoing reasons, Settlement Class Representatives respectfully request that the Court finally approve the Settlement, approve the Notice Program, and enter the Final Judgment and Order of Dismissal with Prejudice.

DATED:  July 20, 2018

**JOHNSON FISTEL, LLP**

*/s/ Michael I. Fistel, Jr.*

MICHAEL I. FISTEL, JR. (admitted *pro hac vice*)

Michael I. Fistel, Jr. (admitted *pro hac vice*)
David A. Weisz (admitted *pro hac vice*)
Murray House
40 Powder Springs Street
Marietta, GA  30064
Telephone: (770) 200-3108
Facsimile: (770) 200-3101
Email: MichaelF@johnsonfistel.com
          DavidW@johnsonfistel.com

**JOHNSON FISTEL, LLP**
Frank J. Johnson (admitted pro hac vice)
Phong L. Tran (admitted pro hac vice)
655 W Broadway, Suite 1400
San Diego, CA  92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
Email: FrankJ@johnsonfistel.com
          PhongT@johnsonfistel.com

*Counsel for Plaintiffs, and Class Counsel on behalf of the Settlement Class*

**TRAGOS, SARTES & TRAGOS, PLLC**
Peter L. Tragos
Florida Bar. No.: 0106744
601 Cleveland Street, Suite 800
Clearwater, FL  33755
Telephone: (727) 441-9030
Facsimile: (727) 441-9254
Email: PeterTragos@greeklaw.com
          Linda@greeklaw.com

*Counsel for Plaintiffs, and Liaison Counsel on behalf of the Settlement Class*

## RULE 3.01(G) CERTIFICATION

The undersigned counsel certifies that he has conferred with Defendant's counsel in a good faith attempt to resolve the issues raised in this motion, and that Defendant's counsel does not oppose the relief requested herein.

DATED: July 20, 2018

**JOHNSON FISTEL, LLP**

*/s/ Michael I. Fistel, Jr.*

MICHAEL I. FISTEL, JR. (admitted *pro hac vice*)

40 Powder Springs Street
Marietta, GA  30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
Email: MichaelF@johnsonfistel.com

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on this day, he electronically filed the above and foregoing with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

**JOHNSON FISTEL, LLP**

*/s/ Michael I. Fistel, Jr.*

MICHAEL I. FISTEL, JR. (admitted *pro hac vice*)

Murray House
40 Powder Springs Street
Marietta, GA  30064
Telephone: (770) 200-3104
Facsimile: (770) 200-3101
Email: MichaelF@johnsonfistel.com

– 27 –